## UNITED STATES DISTRICT COURT
### DISTRICT OF DELAWARE

| | |
|---|---|
| PATRICK AYERS, Derivatively on Behalf of PURECYCLE TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br>   v. <br><br> MICHAEL OTWORTH, RICHARD BRENNER, TANYA BURNELL, JAMES DONNALLY, ANDY GLOCKNER, FERNANDO MUSA, JEFFREY FIELER, AND JOHN SCOTT, DAVID BRENNER, AND MICHAEL DEE, <br><br>   Defendants, <br><br>   and <br><br> PURECYCLE TECHNOLOGIES, INC., <br><br>   Nominal Defendant. | Case No. 1:22-cv- <br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Patrick Ayers, by his undersigned attorneys, respectfully submits this Verified Stockholder Derivative Complaint for the benefit and on behalf of nominal defendant PureCycle Technologies, Inc. ("PureCycle" or the "Company"), against the Individual Defendants (defined herein) as officers and directors of PureCycle for breaches of fiduciary duty, unjust enrichment, and violations of Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff makes these allegations upon personal knowledge with respect to himself and, as to all other matters, upon information and belief developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, filings by PureCycle with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, securities class action lawsuits consolidated in the United Stated District Court for the Middle District of Florida captioned *Theodore v. PureCycle Technologies, Inc.*, Case No. 6:21-cv-809-PGB-GJK (M.D. Fl.) (the "Securities Class Action"), and other public information regarding

1

PureCycle.   Plaintiff believes that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action against certain of PureCycle's officers and members of its Board of Directors (the "Board" or the "Individual Defendants") for breaches of fiduciary duty and violations of the federal securities laws, which has caused and continues to cause substantial monetary damage to the Company and other damages, including damages to its reputation and goodwill.

2.      On November 16, 2020, PureCycle announced that it would list its common stock on the NASDAQ through a reverse merger (the "Merger") with Roth CH Acquisition I Co. ("Roth Acquisition" or "ROCH"), a publicly traded special purpose acquisition company ("SPAC").

3.      The Individual Defendants represented in the Merger documents and in SEC public filings thereafter that PureCycle had "a revolutionary and proprietary cost-effective method to recycle waste polypropylene to virgin-like resin," which it called ultra-pure recycled polypropylene ("UPRP"), that was built on patented technology invented by the Procter & Gamble Company ("P&G") to be globally commercialized by PureCycle.   The Defendants represented further that PureCycle was constructing the Company's first commercial-scale plant in Ironton, Ohio, and intended to build new recycling production facilities globally.   The Defendants further represented that the Company has long term contracts for feedstock to supply the Ironton plant and has entered into long term offtake agreements with leading global customers and Fortune 500 partners for all of the production of its Ironton facility.

4.      As to the management of the Company, the Defendants touted the experience of PureCycle's Chief Executive Officer ("CEO") Mike Otworth ("Otworth"), Chief Commercial Officer ("CCO") David Brenner ("David Brenner"), and Chief Financial Officer ("CFO") Michael Dee

("Dee").  According to their representations, Otworth had over 23 years of experience leading and scaling early-stage companies; David Brenner was responsible for leading PureCycle's commercial expansion over the last four years; and Dee had three decades of experience in public markets, corporate finance, private equity and M&A.

5.      The lie was given to these representations when, on May 6, 2021, Hindenburg Research published a report, based upon extensive research and interviews of multiple former employees and industry experts, revealing that the PureCycle management team previously "deceived investors" i t  brought six other businesses public only to have each implode, "resulting in two bankruptcies, three delistings, and one acquisition after a ~95% decline[,]" with "[o]ver $760 million in public shareholder capital [being]   incinerated in the process."  According to the Hindenburg Report, PureCycle was brought public in order to permit that same spurious management team to "collectively position[] themselves to clear ~$90 million in cash and tradable shares before the company generates a single dime in revenue."

6.      The Report cited industry experts who explained that despite the Company's rosy projections, "PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question."  In the Report, a "30-year expert on polymers, with a background in advanced plastics recycling" opined that PureCycle's "patent is 'indirect,' 'vague' and 'regurgitation' of prior art" and "referred to the company's flammable pressurized process as a 'bomb' and warned about the company foraging ahead to commercial scale despite still having issues at a lab scale."  The Report called into question the representations made about PureCycle's core business: unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process."

7.      The Report concludes that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and  SPAC  sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

8.      The revelations in the Hindenburg Research Report sent PureCycle shares spiraling downward by 40% per share.  Class action lawsuits were swiftly filed against PureCycle, Otworth, and other officers of the Company alleging violations of the anti-fraud provisions of the Federal securities laws.  The Securities Exchange Commission (the "SEC") promptly opened an investigation, issuing a subpoena on the Company and seeking Otworth's testimony.  As a result, PureCycle is subject to substantial costs in defending itself and its executives in the Securities Class Action and the SEC investigation and may incur further costs resolving them.

9.      Through this action, Plaintiff seeks to recover for PureCycle its damages caused by the Individual Defendants' breaches of fiduciary duty and violations of the federal securities laws pled herein.  The Individual Defendants owed and owe the highest fiduciary duties to PureCycle and its stockholders.  They were aware of the material importance of disseminating truthful, accurate and complete information regarding the Company including, but not limited to, its management team, its financial, and its business prospects in compliance with the federal securities laws.  In violation of their fiduciary duties, the Individual made, caused to be made, or acquiesced in numerous false and misleading statements and material omissions, including: (a) that the management team bringing PureCycle public had previously brought six other businesses public only to have each implode thereafter; (b) that the primary motivation of the management team bringing PureCycle public was to to obtain tens of millions of dollars in cash and tradable shares; (c) that PureCycle faces higher competition for raw materials than it represented to investors, materially undermining the management team's financial projections; (d) that PureCycle's patent is nowhere as cogent or

4

valuable as it has led investors to believe, and the technology underlying its business operations is unproven, not yet functional, and presents serious issues even at lab scale.

10.    Since the Individual Defendants are neither disinterested nor independent, the making of a demand upon them would be futile and is thus excused.  In the absence of this action, PureCycle will neither recover its damages nor properly remediate its control weaknesses.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa, because Plaintiff's claims raise a federal question under Section 20(a) of the Exchange Act, 15 U.S.C. §§ 78t(a) and 78t-1(a).

12.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

13.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

14.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

15.    Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), where the Company is the incorporated and where it conducts substantial business.

## PARTIES

16.    Plaintiff is a current PureCycle stockholder, having purchased PureCycle shares on November 2, 2020, and having continuously held those shares since their purchase.

17.     Nominal Defendant PureCycle is a corporation duly incorporated under the laws of the State of Delaware maintaining its headquarters at 5950 Hazeltine National Drive, Orlando, Florida 32822.  PureCycle was formed as a Delaware limited liability company on September 15, 2015, as Advanced Resin Technologies, LLC.  In November 2016, that entity changed its name to PureCycle Technologies LLC ("Old PCT").  On March 17, 2021, PureCycle and Roth Acquisition completed their Merger and PureCycle common stock began to trade on the NASDAQ.

18.     PureCycle seeks to commercialize a process for recycling polypropylene, a common plastic used in everything from carpets to shampoo caps to fishing nets.  Polypropylene represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled because it requires expensive sorting and cleaning due to its use in food packaging.  It is also commonly found in products that use mixed plastics that can be difficult, if not impossible, to separate.  These impracticalities have rendered polypropylene recycling largely uneconomical despite scientists and chemical companies seeking a recycling solution since the discovery of polypropylene in 1951.

19.     Defendant Otworth is, and at all relevant times has been, the CEO of PureCycle and has served as the Chair of the combined company's Board of Directors since completion of the Merger.  He is also CEO of Innventure LLC, PureCycle's former parent, and Old PCT since October 2015 and a member of the Board of ParentCo.  Previously, he served as President and Founding Partner of Green Ocean Innovation from 2008 to 2015, which provided technology sourcing and innovation strategy and development services to Lilly/Elanco Animal Health primarily focusing on therapeutics, diagnostics and various medical devices.  Prior to Green Ocean Innovation, from 1996 to 2000, he served as Vice-President and Founding CEO of multiple start-ups at XL TechGroup ("XLTG"), a venture capital firm.  Additionally, from 2000 to 2008, Otworth was a key senior management leader of XLTG.  He received total compensation of $1,191,600 in 2019, consisting of

base salary of $255,000 and stock awards of $936,600.  He also received $5,000,000 due to the completion of the SPAC transaction.

20.     Defendant Richard Brenner ("Rick Brenner") is, and at all relevant times has been, a director of PureCycle and ParentCo, and Chief Operating Officer of Innventure.  He was CEO and Co-founder of SPRIM Strategy & Intelligent Innovation, a strategy consulting firm, from 2012 to March 2017.  He is the father of Defendant David Brenner.  Rick Brenner received $669,000 in stock awards as director compensation in 2019, and also owned 37,500 Incentive Units[1] as of December 31, 2019.

21.     Defendant Tanya Burnell ("Burnell") has been a director of PureCycle since August 2020 and of ParentCo and serves as the Chair of the Company's Audit Committee.  Since June 2013, Burnell served as a Director of CC Industries, Inc., an affiliate of Henry Crown and Company, a privately owned investment company.  In August 2020, Old PCT issued an aggregate of 37,500 Class C Units to Pure Crown LLC ("Pure Crown"), with an approximate aggregate value of $1,170,000, as compensation for Burnell's board service.

22.     Defendant James Donnally ("Donnally") has been a director of PureCycle since October 2015.  He served as CFO for Glockner Enterprises, a transportation finance, insurance and investment company, since 1996, and he is the CFO of Glockner Finance ("G-Finance").  He was CFO of Innventure and Old PCT from October 2015 to October 2020.  In 2019, he received director compensation of $8,048 in stock awards granted to Assured Solutions Company, Ltd. ("ASC"), an entity in which he holds a 2% interest, and several other entities in which he has an interest.  He also owned 1,500 Incentive Units as of December 31, 2019.

---

[1] The Incentive Units are grants of equity-based compensation issued to select employees and service providers of Old PCT, which units were converted into restricted stock of PureCycle in the Merger.

23.     Defendant Andy Glockner ("Glockner") has been a director of PureCycle since October 2015.  He served as Chairman and CEO for Glockner Enterprises from 1982 until his retirement in 2019.  Glockner is a controlling director of G-Finance, which supplied Old PCT with a revolving line of credit facility in May 2017, of which $12 million remained outstanding, with an interest rate of 16% per year.  In 2019, he received director compensation of $8,048 in stock awards granted to ASC, an entity in which Glockner holds an 8.02% interest.  He also owned 1,503.75 Incentive Units as of December 31, 2019.

24.     Defendant Fernando Musa ("Musa") was appointed a director of PureCycle and a member of its Audit Committee upon the Merger.  He is also a director of ParentCo.  Musa was appointed to the Board pursuant to the Investor Rights Agreement ("IRA") between the Company and Roth Capital Partners, LLC ("Roth Capital"), Craig-Hallum Capital Group, LLC ("Craig-Hallum"), and certain Initial Stockholders and Old PCT Unitholders (collectively, the "IRA Holders") providing that the IRA Holders have the right to elect at least one director of the Company for a period of two years following the Merger.  As stated in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, filed with the SEC on August 12, 2021, notwithstanding the obligations of the directors designated under the IRA "to act in accordance with their applicable fiduciary duties, their interests may be aligned with the interests of the investors they represent, which may not always coincide with our corporate interests or the interests of our other stockholders."

25.     Defendant Jeffrey Fieler ("Fieler") was appointed a director of PureCycle and a member of its Audit Committee upon the Merger by virtue of the IRA between the Company and the IRA Holders.  He is also a member of the Board of ParentCo.  As stated in the Quarterly Report on Form 10-Q for the quarter ended June 30, 2021, filed with the SEC on August 12, 2021, notwithstanding the obligations of the directors designated under the IRA "to act in accordance with their applicable fiduciary duties, their interests may be aligned with the interests of the investors they

represent, which may not always coincide with our corporate interests or the interests of our other stockholders." He owned 607,119 shares of ROCH prior to the merger and 1,307,119 shares of ParentCo after the Merger, having purchased 700,000 shares of ParentCo stock for $7 million in connection with the PIPE. Since June 2010, he is the Founder and Portfolio Manager of Sylebra Capital Management ("Sylebra"), a global investment manager.

26.     Defendant John Scott ("Scott") has been a director of PureCycle since October 2015. He is also a director of ParentCo. He is a Founder and Principal of the Company and has served as the Company's (and Innventure's) Chief Science Officer and as a member of Old PCT's Board of Directors, as well as a senior scientific advisor to the Company's management team, since October 2015. He is a founder of XLTG and served as its CEO from 1993 to 2013. In 2019, he received total compensation of $726,500, consisting of $57,500 in base salary and $669,000 in stock awards. He also was due approximately $1.5 million pursuant to a services agreement between Old PCT and Innventure, payable at the closing of the Merger.

27.     Defendant David Brenner ("David Brenner") has been, the Chief Commercial Officer ("CCO") of PureCycle since August 2020 and of ParentCo. From January 2017 to August 2020, he was Old PCT's Chief Integration Officer. In 2019, he received total compensation of $187,751 in salary. He also received 996,098 Incentive Units as of December 31, 2019. In 2018 and 2017, he received $173,549 and $162,626, respectively, for services provided. He is the son of Defendant Rick Brenner.

28.     Defendant Dee has been the CFO of PureCycle and ParentCo since October 2020. He was the Managing Member of Bird Creek Capital LLC ("Bird Creek"), a consulting services company, providing advice and services to the Company since July 2020. He receives a base salary of $450,000 and is eligible to participate in PCT's (or its successor's) annual bonus program, equity

award program, and certain employee benefit and fringe benefit plans and programs.  He received $3,000,000 solely due to the successful consummation of the SPAC transaction.

29.     Defendants Otworth, Rick Brenner, Burnell, Donnally, Glockner, Musa, Fieler, Scott, Dee, and David Brenner are be referred to herein as the "Individual Defendants."

30.     Byron Roth ("Roth") was, prior to the merger, the Chairman and CEO of Roth Acquisition.  He is the CEO and Chairman of Roth Capital, an investment banking firm in Newport Beach, California that focuses on the small-cap and microcap public market.  Roth Capital, along with Craig-Hallum, were the underwriters of the Company's deal with Roth Acquisition and received almost 2 million shares in the Company for just over a penny per share through their sponsorship of the SPAC deal.  Roth is well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from 2003 to 2012.  Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division.  Roth's FINRA BrokerCheck report shows 15 regulatory sanctions and 12 arbitrations, including a violation of Regulation M, enacted to prevent market manipulation.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and

diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.     In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of PureCycle were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of PureCycle were required to, among other things:

a.   ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.   conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.   properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

    d.  remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

    e.  ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

36.    The Company maintains a Code of Business Conduct and Ethics (the "Code").  The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and consultants of PureCycle and its subsidiaries.

37.    The Code requires:

- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- full, fair, accurate, timely and understandable disclosure in reports and documents that PureCycle files with, or submits to, the United States Securities and Exchange Commission ("SEC") or any other governmental agency and in other public communications;

- compliance with applicable governmental laws, rules and regulations;

- the prompt internal reporting of violations of this Code to the persons identified herein; and

- accountability for adherence to this Code.

38.    In addition, the Code provides that:

Each Employee and Director must make prompt and full disclosure in writing to his or her department management or the General Counsel of the following prospective situations that may involve a perceived or actual conflict of interest:

- An Employee, a Director, or a member of the Employee's or Director's family has a significant financial interest in any outside enterprise that does or seeks to do business with or is a direct or indirect competitor of the Company. As a minimum standard, a "significant" financial interest exists with respect to a company where (A) there is greater than 2% ownership of the company (5% in the case of a public company), (B) a family member is associated with the company, or (C) there is any other interest in the company in excess of 5% of the company's assets or annual revenue.

- The Employee or Director serves as a director, officer, partner, consultant or employee to any outside enterprise that does or is seeking to do business with or is a competitor of the Company.

- Acting as broker, finder, go-between or otherwise for the benefit of a third party in transactions involving or potentially involving the Company or its interests.

- Any other arrangement or circumstance, including family or other personal relationships, that might dissuade the Employee or Director from acting in the best interest of the Company.

39.     Finally, the Code requires:

Compliance with the Law.  All Employees and Directors are expected to comply with all applicable laws, rules and regulations.

Compliance and Reporting.  Employees and Directors are expected to comply with this Code and its underlying policies and procedures to protect the Company and its Employees and Directors from criticism, litigation or embarrassment that might result from alleged, perceived or real conflicts of interest or unethical practices. Violations of this Code are grounds for disciplinary action up to and including discharge and possible legal prosecution.

40.     Furthermore, the Company's Audit Committee is specifically tasked with oversight responsibilities assessing, among other things, the appropriateness of the accounting and reporting policies that are used by the Company, the Company's compliance with legal and regulatory requirements, the Company's Code of Business Conduct and Ethics, and preparation of all reports

required to be included in the Company's proxy statement. The conduct of the Audit Committee is governed by the Audit Committee Charter.

41.    Pursuant to the Audit Committee Charter:

- Consider and review with the independent auditors and management: (i) the adequacy of the Company's disclosure controls and procedures and internal controls, including computerized information system disclosure controls and procedures and security; (ii) all changes in the Company's internal control over financial reporting which could materially affect the Company's ability to record, process, summarize and report financial data; [and] (iii) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting;

- Review with management and the independent auditors significant financial risks or exposures to the Company's business and assess the steps management has taken to monitor and minimize such risks. Discuss with management and the independent auditors the Company's underlying policies and guidelines with respect to risk assessment and risk management, including with respect to data protection and business continuity;

- Review the effectiveness of the system for monitoring compliance with laws and regulations; and

- Review any material issues that arise under the Company's Code of Business Conduct and Ethics. The Committee is to receive reports from Company management of evidence of any violation of securities laws or breaches of fiduciary duties or violation of the Code of Business Conduct and Ethics by (a) any officer or director of the Company or any material subsidiary of the Company or (b) any other employee whose violation or breach is significant, as determined by either Company management or the IA Executive.

### SUBSTANTIVE ALLEGATIONS

### PureCycle Goes Public Through A Merger With A SPAC

42.    A SPAC is a shell company set up for the sole purpose of raising money through an initial public offering to use in order to acquire another company. Prior to effecting such an acquisition, the SPAC performs no activity other than pursuing an acquisition(s) candidate.

43.     Roth Acquisition was incorporated under the laws of the State of Delaware on February 13, 2019, as a SPAC.  On May 4, 2020, Roth Acquisition consummated its IPO of 7.5 million shares generating gross proceeds of $75 million.

44.     On November 16, 2020, PureCycle issued a press release announcing that it would become a publicly traded company via an agreement and plan of merger with Roth Acquisition.  In the press release, PureCycle stated that it had "a revolutionary and proprietary cost-effective method to recycle waste polypropylene to virgin-like resin" that was "built on patented technology invented by [P&G], to be globally commercialized by PureCycle."  PureCycle further represented in the press release:

> PureCycle Technologies LLC holds the exclusive global license to commercialize the only patented solvent-based purification recycling technology for restoring waste polypropylene into virgin-like resin. This process, developed by The Procter & Gamble Company ("P&G"), and commercialized by PureCycle, is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene, utilizing approximately 75% less energy. PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene. PureCycle intends to obtain a Letter of No Objection from the U.S. Food and Drug Administration for its UPRP to be used in food grade applications.

> Strong interest and broad global awareness of PureCycle has resulted in strategic investments and highly-attractive offtake agreements with notable groups including Aptar, BMW i Ventures, Closed Loop Partners, Glockner Enterprises, L'Oréal, Milliken & Company, P&G, Ravago, and Total. As a result of this strong demand, PureCycle has contracted pricing for its UPRP that is both de-linked from commodity pricing and at a premium to virgin polypropylene resin. Combined with abundant polypropylene waste feedstock, PureCycle expects to achieve EBITDA margins in excess of 50% from the Company's first seven plants in 2024.

> The Company is building its first commercial-scale plant in Ironton, Ohio, which is expected to have nameplate capacity of approximately 107 million pounds per year when fully operational. Production is expected to commence in late 2022 with full capacity expected to be achieved in 2023. PureCycle raised approximately $250 million in a tax-exempt municipal bond offering in October 2020 to fund the construction of the Ironton facility. The Company has long term contracts for feedstock to supply the Ironton plant production and has entered into long term offtake agreements with leading global customers and Fortune 500 partners for all of the production of its UPRP from the Ironton facility.

PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035. In addition to PureCycle's first plant in Ironton, Ohio, the Company expects to announce its next location in Europe and to commence production in 2023 with a nameplate capacity of approximately 107 million pounds when fully operational. Additional expansion in the United States is expected to include five scaled up commercial lines capable of producing over 165 million pounds each of its UPRP. Pre-engineering for the design and installation of five commercial lines in a single "cluster" site is currently underway and will result in a combined capacity of over 825 million pounds annually in one location. Production from the Ironton, Europe, and cluster sites are expected to bring over 1.2 billion pounds of annual recycled polypropylene to the market in the next five years.

"This transaction represents a key milestone in PureCycle's mission to transform polypropylene into a recyclable and sustainable product," said Mike Otworth, CEO of PureCycle. "Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates. The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of our proven technology addressing the immense global problem associated with polypropylene waste. The current global challenges surrounding polypropylene waste are significant. Of the approximately 170 billion pounds of polypropylene waste produced annually, less than 1% is recycled today; the remainder largely ends up in landfills and the ocean, creating a massive environmental problem. We look forward to partnering with the Roth CH team on an efficient, accelerated path for a successful public listing."

45.     The press release quoted Roth, Chairman and CEO of ROCH, as stating:

*We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks. We believe PureCycle's technology will be transformative in plastic recycling and help companies meet their sustainability goals.* We look forward to sharing additional details on this exciting transaction in the coming months. We appreciate all of our shareholders and investors that have participated in the IPO and PIPE transactions. We look forward to a successful future together.

46.     The press release touted the experience of PureCycle's management team:

PureCycle is retaining its *experienced management team*, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience leading and *scaling early-stage companies*. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly three decades in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.

47.     Defendants also provided a link to a webinar on which Defendants Otworth, Dee, and David Brenner presented information regarding PureCycle's business metrics and financial prospects, and filed with the SEC a slide deck they produced for that presentation, which touted PureCycle's experienced management team:



pe___

48.    In the presentation, Defendants Otworth, Dee, and David Brenner also highlighted the purported value of the Company's technology and intellectual property rights, stating, in pertinent part:



49.    After detailing "Multiple Contingencies in Place to De-Risk Construction and Operations" and the plant construction rollout, Defendants also provided financial guidance reflecting strong business prospects for the Company:

## Process Enables Highly Attractive Economics

*PureCycle expects consistent, replicable economics that are more profitable than commodity virgin polypropylene, resulting from lower feedstock than traditional production and premium pricing*

| | PURECYCLE Plants 1 (107M LBS)[1] | PURECYCLE Plant 2 (107M LBS)[1] | PURECYCLE Future 5 Plant Clusters (165 LBS *5 = 825M LBS)[1] | | |
|---|---|---|---|---|---|
| **Price / lb** | $0.90 | $1.00 | $1.00 | $1.50 | Recent LOIs at $2.00/lb |
| Annual Gross Revenue | $97M | $107M | $825M | $1,238M | |
| **Feedstock Cost / lb** | $0.16 | $0.16 | $0.14 | $0.14 | |
| Annual Feedstock Cost | $18M | $18M | $119M | $119M | |
| **Operating Costs / lb[2]** | $0.29 | $0.29 | $0.27 | $0.27 | |
| Annual Operating Costs | $31M | $31M | $227M | $227M | |
| **EBITDA / lb** | $0.45 | $0.55 | $0.58 | $1.08 | |
| Annual Run-Rate EBITDA | $48M | $59M | $479M | $891M | |
| **Unlevered FCF / lb[3]** | $0.42 | $0.52 | $0.56 | $1.06 | |
| Annual Run-Rate UFCF | $45M | $55M | $465M | $877M | |
| **Production Timing** | Oct 2022 | June 2023 | 2023/2024 | 2023/2024 | |

## Financial Projections

*($ in millions, except net revenue / lb)*

| | Projections | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | FY 2020P | FY 2021P | FY 2022P | FY 2023P | FY 2024P | FY 2025P | FY 2026P | FY 2027P |
| Operational Plants | - | - | 1 | 5 | 7 | 10 | 14 | 18 |
| Installed Capacity (mm lbs) | - | - | 119 | 853 | 1,219 | 1,769 | 2,503 | 3,236 |
| Effective Utilization (at 90% uptime) | - | - | 10% | 33% | 86% | 69% | 75% | 80% |
| Production (mm lbs) | - | - | 11 | 255 | 890 | 1,152 | 1,752 | 2,412 |
| Net Revenue | - | - | $8 | $224 | $820 | $1,077 | $1,659 | $2,325 |
| Net Revenue / lb | - | - | $0.76 | $0.88 | $0.92 | $0.94 | $0.95 | $0.96 |
| Feedstock Cost | - | - | 1 | 36 | 131 | 170 | 255 | 312 |
| Other Variable Costs | - | - | 3 | 52 | 170 | 222 | 342 | 477 |
| Labor | - | - | 1 | 12 | 31 | 39 | 59 | 81 |
| Plant Overhead | - | - | 0 | 2 | 5 | 6 | 10 | 13 |
| Gross Margin | - | - | $3 | $121 | $484 | $639 | $993 | $1,442 |
| Gross Margin (%) | NM | NM | 33% | 54% | 59% | 59% | 60% | 62% |
| Plant SG&A | - | - | 0 | 4 | 13 | 16 | 25 | 34 |
| Rent | - | - | 0 | 1 | 3 | 4 | 5 | 7 |
| Corp Expense | 3 | 10 | 14 | 16 | 18 | 19 | 20 | 21 |
| EBITDA | ($3) | ($10) | ($12) | $100 | $450 | $601 | $943 | $1,380 |
| EBITDA Margin (%) | NM | NM | NM | 45% | 55% | 56% | 57% | 59% |
| D&A | - | - | 3 | 31 | 75 | 96 | 142 | 192 |
| EBIT | ($3) | ($10) | ($15) | $69 | $375 | $505 | $801 | $1,187 |
| Growth Capital Expenditures | $21 | $266 | $690 | $620 | $598 | $881 | $931 | $949 |
| Maintenance Capital Expenditures | $- | $- | $1 | $9 | $20 | $26 | $38 | $51 |

50.     On November 16, 2020, Defendants filed with the SEC a preliminary proxy statement on Schedule 14A, which they amended on February 12, 2021, to schedule the special meeting of shareholders on March 16, 2021.  Like the November 16, 2020, press release, the proxy touted the strength of the Company's business, technology, management, and intellectual property rights, stating, in pertinent part:

> PCT's ground-breaking patented recycling process, developed by Procter & Gamble and licensed to PCT, separates color, odor and contaminants from plastic waste feedstock to transform it into ultra-pure recycled polypropylene. PCT's recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.

51.     Describing the ROCH Board's reasons for approval of the business combination, the proxy stated:

> In particular, ROCH's Board considered the following positive factors, although not weighted or in any order of significance:
>
> - Strong Technology Representing Significant Innovation: PCT's unique, patented process separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), allowing for a broader range of feedstock than traditional recycling. This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.
>
> - PCT Secured Significant Investment by Lenders and Satisfied Bond Investor Due Diligence: PCT's Construction Indebtedness involve three levels of technology requirements:
>   - Public report regarding *independent evaluation of technology*;
>   - *Scaling risk quantification*; and
>   - Infrastructure evaluation.
>
>   As well as meeting the following commercial requirements:
>   - *Proof of scale up*;
>   - *20+ year feedstock agreements*; and
>   - *20+ year offtake agreements*.

52.     As with the Company's November 2020 press release, the proxy also touted the

apparent strength of PureCycle's management team, stating:

> **Strong Management Team:** The **PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D**, sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has over 23 years' experience **leading and scaling early stage companies**, holding multiple senior management positions with a **proven track record** of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has over 30 years of public markets, corporate finance, and M&A experience. Chief Science Officer John Scott holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings over 15 years' **experience leading transformational projects in a range of industries** and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over 100 years' experience leading operations and over 70 years operating equipment.

53.     Defendants also filed soliciting material with the 14A in which Defendant

Otworth stated, in part:

> [Demand for polypropylene] continues to grow, yet recycling rates aren't growing. So what's really needed is a game changing, transformational technology that will drive higher utilization of recycled polypropylene and that's our mission and **that's what we will succeed in doing going forward**.
>
> ***
>
> The slide demonstrates a bit of the difference between what mechanically recycled polypropylene is typically used for today and **what our customers will be able to use our resin for**. So you see, the black pellets, that's what and that's what recycled polypropylene often looks like today. You have all different colors that are ground up. And so, as we know, when you mix every color of the rainbow, you end up with black. And, you know, this type of dark colored resin is used for things like trash cans and battery casings. But it can't be used for applications where you need bright brand colors, where you need food-contact grade resin, and where you the typical types of products and packaging that represent premium products are rather inconsistent withso, you know, what you can make out of mechanically recycled plastic today. **We're changing that in a very dramatic way. And so, as I said, customers can use our resin, they can use it interchangeably with virgin resin,**

*and they can make, you know, the same brand colors with the same appearance in the same degree of hygiene that that they expect from virgin resin today*.

54.     On November 20, 2020, Roth Acquisition and PureCycle filed with the SEC a Registration Statement on Form S-4. In the Registration Statement, Defendants stated, in relevant part:

> ***Proprietary and Proven Technology Developed by Procter & Gamble***
> PCT utilizes a proprietary purification process that converts waste polypropylene feedstock into UPRP pellets with similar characteristics to virgin polypropylene. The Technology was developed by P&G, and PCT has a global license from P&G. PCT's process utilizes a broad range of feedstocks including waste carpet, stadium cups and supersacks and produces virgin-quality UPRP pellets that are clear, odorless and contaminant-free, making it suitable for use in almost all polypropylene applications including high-value, food grade consumer products. This patented process was developed by P&G over the course of eight years and has been refined by PCT over the past five years with more than 350 laboratory tests and with over 1,000 pounds of UPRP produced at the Feedstock Evaluation Unit (also called the "FEU" or "Phase I Facility") since its commissioning in July 2019. In addition, PCT's purification process and UPRP quality have been validated by independent technical consultants and many of PCT's strategic partners and initial customers.

55.     On February 12, 2021, PureCycle filed a Proxy Statement for Special Meeting of Stockholders of Roth Acquisition on Form 424B3 with the SEC. In the Proxy Statement, the Company represented that it is "a leader in polypropylene recycling and polymers sustainability" and repeated representations from its preliminary proxy statement and S-4 regarding the efficacy of the technology it licensed from P&G to restore waste polypropylene into resin with near-virgin characteristics.

56.     On March 18, 2021, PureCycle announced that its business combination with Roth Acquisition was approved by Roth Acquisition's shareholders at a special meeting held on March 16, 2021, and that PureCycle's shares would begin trading under the ticker symbol "PCT"

Case 1:22-cv-00110-RGA   Document 1   Filed 01/27/22   Page 23 of 51 PageID #: 23

beginning the same day.[2]  In the press release, PureCycle stated that it "uses proprietary technology licensed from Procter & Gamble to recycle waste polypropylene (PP) into virgin-like recycled PP for myriad applications.  The company is at the intersection of an enabling technology meeting a compelling global need."

57.     Defendant Otworth was quoted in the press release as stating that "[t]he consummation of this transaction represents yet another major milestone for PureCycle, demonstrating broad market validation of our value proposition . . . . Most importantly, we now have the increased capital market access to support the accelerated scaling required to revolutionize the transformation of waste propylene into sustainable products."  Otworth further stated that: "[o]ver the last three months, PureCycle has further developed its financial and manufacturing capabilities. . . . This is now an execution game for PureCycle.  It's incumbent on us to pull forward the best most knowledgeable leaders to ensure thatwe realize the full potential of this technology."

58.     On April 21, 2021, PureCycle issued a press release representing that:

PureCycle uses proprietary technology licensed from The Procter & Gamble Company (P&G) to recycle waste PP into virgin-like recycled PP for a myriad of applications. The company is the intersection of an enabling technology meeting a compelling global need: only approximately 1% of the 170 billion pounds of PP consumed last year was recycled as compared to almost 20% for polyethylene terephthalate (PET), according to the American Chemistry Council.

**PURECYCLE IS DAMAGED WHEN THE TRUTH REGARDING ITS RECYCLING TECHNOLOGY AND MANAGEMENT TEAM IS REVEALED**

59.     On May 6, 2021, investment research firm Hindenburg Research published a report on PureCycle entitled "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored by

---

[2]  *See* https://finance.yahoo.com/news/purecycle-technologies-completes-business-combination-124100921.html (last visited November 11, 2021).

the Worst of Wall Street" (the "Report").  In the Report, Hindenburg stated that: (1) Hindenburg "spoke with multiple former employees of" Defendant Otworth's and other PureCycle executives' former companies "who said PureCycle's executives based their financial projections on 'wild ass guessing', brought companies public far too early, and had deceived investors;" (2) unlike most "leading plastics companies [who] publish peer reviewed studies that detail their advancements in the field," Hindenburg was "unable to find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;" (3) "multiple competitors and industry experts . . . explained that PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question;" (4) "a 30-year expert on polymers, with a background in advanced plastics recycling . . . told us the company's patent is 'indirect,' 'vague,' and a 'regurgitation' of prior art;" (5) the same expert "referred to the company's flammable pressurized process as a 'bomb' and warned about the company forging ahead to commercial scale despite having issues at a lab scale;" and (6) in conclusion, that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

60.     Hindenburg noted that although PureCycle previously announced that it aimed to generate revenue from its "commercial scale production facility in late 2020," that in its latest company presentation, PureCycle "revised that target to late 2022, at the earliest, when it hopes to finish most of the commercial 'Phase II' portion of its plan and generate $8 million in revenue. From there, the company boldly projects $224 million of net revenue in FY2023, *which it then plans to grow nearly ten-fold* – to $2.3 billion by 2027."  (Emphasis in original).  Hindenburg wrote that PureCycle "put its aggressive projections through a bit of a torture session in order to justify

its valuation. In a corner of the plastics recycling world that has eluded economic sustainability for the world's top chemical companies, those numbers would put PureCycle's margins on par with some of the world's most profitable tech companies."

61.     Hindenburg further wrote that "the only two investment banks whose 'research' divisions cover PureCycle are Roth and Craig Hallum, the two sponsors of the deal. Both have put 'Buy' ratings on the company, with price targets rangingfrom $45-48."  Hindenburg noted that "Craig Hallum issued its 'Buy' rating and a $48 price target on March 18, 2021, the very day PureCycle went public." (Emphasis omitted).  However, Hindenburg pointed out, two partners within Craig Hallum's research division received shares of PureCycle in the merger, which became eligible for sale on April 16, 2021 due to the elevated stock price.  Then five days after Roth Acquisition's shares were unlocked for sale, the research department at Roth issued a "Buy" rating on PureCycle, assigning a $45 price target.  As Hindenburg noted, "[t]he rest of Roth and Craig Hallum's founder's shares will become freely tradeable in September 2021, well before any revenue is generated by [PureCycle].  Both firms stand to gain considerably regardless of how the company's plans work out."

62.     Hindenburg also tracked how Defendant Otworth and three other senior executives, including Defendant Rick Brenner, have taken at least six companies public.  Hindenburg wrote: "[a]ll have failed. . . . Of the six companies taken public by PureCycle Senior Executives, two went bankrupt, three were delisted, and one was acquired following a ~95% decline.  Over $760 million in public shareholder capital was incinerated in the process."

63.     Hindenburg reported that before PureCycle announced it was going public through the SPAC merger in November 2020, it was owned and controlled by Innventure, which was founded by Otworth, Rick Brenner, and PureCycle's Chief Science Officer and Director Dr. John

Scott ("Scott").  Defendant Donnally was engaged as Innventure's CFO.  In a press release dated April 21, 2017, and entitled *Wasson Enterprise and Innventure Form New Joint Venture to Commercialize Innovative Technologies*, Innventure's management team takes credit for what it misleadingly characterizes as "six successful IPOs."  In reality, each of these purportedly "successful IPOs" resulted in significant investor losses:

- ChromaVision Medical Systems ("ChromaVision") made imaging systems to detect cellular diseases. PureCycle's Scott served as Chairman of ChromaVision. ChromaVision amassed a $64.2 million accumulated deficit by end of year 2001 and received a notice of delisting in October 2004.

- eMerge Interactive, Inc. ("eMerge") was an online cattle auctioneer. PureCycle's Scott served as Chairman at eMerge, beginning in September 1994, before resigning in November 2001. eMerge amassed a $212.4 million accumulated deficit by the end of 2005. eMerge filed for Chapter 11 bankruptcy and was delisted in 2007.

- AgCert International, Ltd. ("AgCert") focused on reducing emissions from pig dung. Bill Haskell, CEO of PureCycle's parent, Innventure, acted as "representative" for his group's investment in AgCert and also served as the company's interim CEO in 2005 through at least 2007. AgCert amassed a $141.1 million accumulated deficit by mid-2007. The company delisted after "misjudging its carbon credit portfolio" in 2008 and filed for insolvency in 2012.

- TyraTech, Inc. ("TyraTech") was focused on developing insect control products. Rick Brenner served as founding CEO at TyraTech until 2009. TyraTech went public during his tenure and amassed a $55.5 million accumulated deficit by his departure. TyraTech was acquired in 2018 for just $2.15 million after declining approximately 95% from its highs.

- PetroAlgae claimed to have found a way to economically turn algae into fuel. PureCycle's Scott served as CEO of PetroAlgae. The zero-revenue company filed to go public in 2010. PetroAlgae amassed a $73.8 million accumulated deficit by 2010, and the company was delisted onto the OTC pink sheets by 2011. Scott resigned as Chairman in February 2012. The company changed its name in 2012 and ultimately had its securities registration revoked in 2017.

- \*   XL TechGroup, Inc. ("XL TechGroup") was a venture capital/incubator company that preceded Innventure. PureCycle's Scott served as Co-Founder and CEO of XL TechGroup and Otworth held a C-level role at XL TechGroup. Bill Haskell, CEO of PureCycle's parent, Innventure, served as

Co-Founder and President of XL TechGroup. The company went public in 2004, amassed a $189.6 million accumulated deficit, and its stock was delisted and cancelled in August 2008.

64.     Hindenburg wrote that it "connected with former employees of several of the failed public companies led by PureCycle's executive team referenced above."   One former senior employee of one of these companies, PetroAlgae, said "I think they did con [investors] . . . that's a strong word but I think it's accurate.  I think because of the biofuel boom especially in algae they were forced into the same hype as all the other algae biofuels just to get funding.  I think it was deceiving to the investors and I couldn't have done that personally.  But a lot of salespeople have that mentalitywhere they overpromise and think they can make it happen.  It just didn't at that time."

65.     Hindenburg also spoke with a former employee of AgCert, another company the PureCycle senior executives had taken public, who said that the company was "too aggressive" with forward sales projections: "[t]here was a lot of wild ass guessing going on there, and as a warning to investors: this is speculative you could lose all your money so jump in if you want."

66.     Hindenburg spoke with a former employee of Tyratech, another company that the PureCycle executives took public, who said that "the dossier that Tyratech went to market with was really not, I know now, it was not credible."

67.     In the Report, Hindenburg also detailed how PureCycle's executive team received $7 million in cash bonuses simply for closing the SPAC deal with Roth Acquisition, and are slated to receive approximately $40 million in compensation before PureCycle generates any revenue. Indeed, Defendant Otworth himself, according to Hindenburg, collected $5 million in bonuses after the deal with Roth Acquisition closed.

68.     The Report also called into question the technology that PureCycle licensed from Procter and Gamble and has repeatedly touted: "[o]ne might wonder, if the technology was a major breakthrough, as described in the company's presentation . . . why P&G didn't license it to a chemical company like Dow or well-established plastics or polycarbon companies rather than a team with a history of repeated failures and no specific polycarbon expertise?  Or, why not develop the technology internally as a new income stream?"  The Report cited a written Q&A session with a Procter & Gamble employee who was asked this question.  That employee "explained that a Global Business Development Director at P&G had a personal relationship with the team at PureCycle's parent company, Innventure, and made the connection. . . . The P&G employee that bridged the deal appears to have later taken a senior position at PureCycle, now serving as VP of Commercial and Business Development."  Hindenburg wrote that its "analysis leads us to believe that P&G likely had a 'technology' that it saw no economic sense in commercializing itself, so it spun it off, providing a steady stream of positive PR for the plastic producing giant, showcasing its efforts to promote recycling."

69.     The Report also noted that "[o]ne of the key challenges (and likely future bottlenecks) of PureCycle's proposed process is in securing enough quality feedstock to make the process economical."  Indeed, in a November 2020 interview, Procter & Gamble's inventor of the technology was asked about this potential bottleneck who said: "I think the fact that you have to ensure you have feedstock coming in and I think that'll be a bottleneck is ensuring the feedstock is of the rightquality, at the right quantity, to keep the larger plants running."

70.     Hindenburg also spoke with Scott Saunders, General Manager of KW Plastics and Chairman of the Association of Plastics Recyclers.  The Report quotes Saunders as stating that:

> The problem I see with chemical recycling – and I'm not an expert in this process but I am an expert in PP raw materials – there is not enoughnon-contaminated PP

scrap to support these processes. So you're going to get a wide range of materials
that have varying degrees of other resin contamination." He added that "[a]nd
what's stated publicly by PureCycle themselves is that the facility works well
up to 5 percent contamination. I've been buying PP scrap for 30 years and I'm
not aware of any PP scrap in volume that has any less than 5% contamination in
the world.

71.     Hindenburg also spoke with Richard Minges, a 10-year executive for Custom

Polymers, who stated "it's more about the raw materials that can be secured."  He continued that

PureCycle is:

stating that they're going to sell their resin for as much as $2 a pound, which is a
huge premium. And the people that we have that are paying premium right now is
because they only need a small amount and it's a marketing ploy and they want it
secured. And if I go back to these same people and tell them I have a 10x as much
and the price is going up to $2 then I don't know a single one who would pay.

72.     Hindenburg also wrote that it was "unable to find a single peer reviewed study in any

scholarly journal citing PureCycle's licensed process," and that "PureCycle's licensed patents

seem to rely heavily on prior discoveries that never ended up reaching commercial scale."

73.     On the latter point, Hindenburg wrote that it consulted with a "30 year expert in

polymers," who stated that "[t]here is no mention of the needed actual testing of the final product.

It is indirect and vague.  The hazards are clearly minimized, which is typical when serious hazards

are expected and read by someone without any prior knowledge or experience."  The same expert

stated, according to Hindenburg, that "[w]hile the n-butane & propane blends for solvent, heated

and pressurized may extract a slightly higher concentration of PP per cycle pass than carbon

dioxide and n-butane, it is still apparently very low.  PureCycle doesn't disclose what these values

are in the scaled-up testing."  He concluded: "[t]he permitting, engineering, and equipment would

be very expensive and a challenge full scale.  The plastic recovered may or may not be accepted or

usable. I don't think the process could ever be cost efficient. The process is expensive, the test

requirements and documentation is extensive, and the value of the product just isn't high enough."

Hindenburg further detailed that PureCycle's licensed technology presented issues at "lab scale," rendering larger scale development as even more problematic.

74.     PureCycle's stock price plunged after publication of the Hindenburg Report, falling from $24.59 per share to $14.83 per share, representing a one-day drop of approximately 40% on unusually heavy trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

75.     In the wake of the news and the resulting stock price drop, class action lawsuits were filed against the Company, Otworth, and Dee, asserting violations of federal securities laws under Section 10(b) and Section 20(a) of the Exchange Act.  On September 27, 2021, the Lead Plaintiffs in the Securities Class Action filed a consolidated amended complaint on behalf of a putative class of investors who purchased or otherwise acquired the Company's securities between November 16, 2020 and May 5, 2021, inclusive, predicated upon the information in the Hindenburg Report.

76.     On November 10, 2021, PureCycle filed a Quarterly Report on Form 10-Q (the "3Q21 10-Q") that disclosed that on or about September 30, 2021, the SEC issued an investigative subpoena to Defendant Otworth connected with an agency, non-public, fact-finding investigation of the Company.  The 3Q21 10-Q also disclosed that in addition to documents, the SEC subpoena sought Otworth's testimony regarding statements made in connection with the Company's technology, financial projections, key supply agreements, and management.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

77.     Plaintiff brings this action derivatively and for the benefit of PureCycle to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of PureCycle, unjust enrichment, abuse of control,

gross mismanagement, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

78.     PureCycle is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

79.     Plaintiff is, and has been at all relevant times, a stockholder of PureCycle and was a stockholder of the Company at the time of the transactions alleged herein. Plaintiff will adequately and fairly represent the interests of PureCycle in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

80.     As directors of PureCycle, the Individual Defendants were required to implement and maintain an effective system of internal controls for the Company. However, in direct contravention of that duty, the Individual Defendants failed to implement and maintain internal controls or exercise oversight over the reporting of truthful, accurate, and complete information in compliance with the federal securities laws.

81.     The Board members are not independent of each other and face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company and its stockholders by their participation or acquiescence in the wrongdoing alleged herein, their failure to investigate and take action when timely action could have prevented, or at least minimized, the damage caused to PureCycle by the misconduct pled herein, and their failure to ensure the Company's implementation and maintenance of an adequate system of internal controls and corporate governance practices and procedures. A pre-suit demand on the Board is futile and, therefore, excused.

A.     **Demand Upon Defendant Otworth Is Excused**

82.     As admitted by PureCycle in its public filings, Otworth is the Company's CEO since the merger, was CEO of Innventure and Old PCT since October 2015, and is a member of the Board of ParentCo. He is thus a non-independent director and therefore is not independent under Nasdaq listing rules. Indeed, PureCycle's Proxy Statement does not list Otworth as an independent director.  As an employee, Otworth derives substantially all of his income from his employment with PureCycle, including $1,191,600 in fiscal year 2019 alone, thus he could not consider a demand for action that might require him to sue directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

83.     Otworth will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Otworth holds 3,994,755 shares of ParentCo's shares, more than 3% of the outstanding shares.  If Otworth acknowledged that he, PureCycle or others had engaged in misconduct, his investment in PureCycle would be substantially devalued. Further, if Otworth acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as the CEO of the Company, either knew of the wrongdoing or should have known of the wrongdoing.

84.     Otworth personally made or signed off on several false and misleading statements and material omissions, including those made in the Forms S-4 and 14A, and in the November 16, 2020, and March 18, 2021 press releases, and as CEO, he knew that the statements were inaccurate.

85.     Otworth is a named defendant in the Securities Class Action alleging violations of the federal securities laws, as such, he is incapable of considering a demand to commence and vigorously prosecute this action with the required independence and disinterest.

86.     Moreover, Otworth, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls

over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

87.     Otworth was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags. Had Otworth taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

88.     Further, Otworth has long-standing business relationships with several other directors which precludes them from acting independently and with disinterest.  Prior to the Merger, Innventure – the majority owner of Old PCT -- was founded and directed by Otworth, Rick Brenner, and Scott, and Donnally was engaged as Innventure's CFO.  In fact, Innventure continues to be the Company's second largest stockholder, owning approximately 8% of the outstanding shares of PureCycle.  Otworth, Rick Brenner, and Scott are also directors of ParentCo, together with Burnell, Musa, and Fieler, and Rick Brenner's son, David Brenner, is also CCO of ParentCo.  Similarly, Defendants Otworth and Scott were intimately engaged together in the management and operation of XLTG for more than ten years.

89.     Otworth is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Otworth is futile and, thus, excused.

**B.     Demand Upon Defendant Rick Brenner Is Excused**

90.     As admitted by PureCycle in its public filings, Rick Brenner is a Company Director since 2015, a director of ParentCo, and Chief Operating Officer of Innventure.  He is thus a non-independent director and therefore is not independent under Nasdaq listing rules.  Indeed, PureCycle's Proxy Statement does not list Rick Brenner as an independent director.  Rick Brenner receives substantial compensation in the form of fees, stock awards, and other compensation, including $669,000 in fiscal year 2019 alone, thus he could not consider a demand for action that might require him to sue directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

91.     Rick Brenner will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Rick Brenner held 37,500 Incentive Units, which units were converted into restricted stock of PureCycle in the merger.  If Rick Brenner acknowledged that he, PureCycle or others had engaged in misconduct, his investment in PureCycle would be substantially devalued.  Further, if Rick Brenner acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor in the Company, either knew of the wrongdoing or should have known of the wrongdoing, which he would not do.

92.     Moreover, Rick Brenner, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

93.     Rick Brenner was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags. Had Rick Brenner taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

94.     Further, Rick Brenner has long-standing business relationships with several other directors which precludes them from acting independently and with disinterest.  Prior to the merger, Innventure – the majority owner of Old PCT -- was founded and directed by Otworth, Rick Brenner, and Scott, and Donnally was engaged as Innventure's CFO.  In fact, Innventure continues to be the Company's second largest stockholder, owning approximately 8% if the outstanding shares of PureCycle.  And Otworth, Rick Brenner, and Scott are also directors of ParentCo, together with Burnell, Musa, and Fieler, and Rick Brenner's son, David Brenner, is also CCO of ParentCo.

95.     Rick Brenner is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws. Any demand upon Defendant Rick Brenner is futile and, thus, excused.

### C.     Demand Upon Defendant Burnell Is Excused

96.     Defendant Burnell is a Company Director since August 2020 and of ParentCo. Burnell will not sue those responsible for the wrongdoing pled herein because doing so would harm her and her investments.  Prior to the merger, 37,500 Class C Units of Old PCT, worth an approximate aggregate value of $1,170,000, were owned by Pure Crown, which units were converted into restricted stock of PureCycle in the merger.  If Burnell acknowledged that she, PureCycle or others had engaged in misconduct, her investment through Pure Crown in PureCycle would be substantially devalued.  Further, if Burnell acknowledged that executives at PureCycle

had engaged in the wrongdoing alleged, she would be acknowledging that she, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing, which she would not do.

97.     Moreover, Burnell, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

98.     Burnell was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags. Had Burnell taken timely action, the damage caused to PureCycle could have been prevented and minimized.

99.     Further, as a member of the Audit Committee, Burnell had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of her obligations under the Audit Committee Charter, Burnell failed to ensure that an adequate system of internal controls were implemented and maintained, exposing the Company to material financial risk.

100.     Burnell is neither disinterested nor independent and faces a substantial likelihood of liability for her breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Burnell is futile and, thus, excused.

**D.     Demand Upon Defendant Donnally Is Excused**

101.    As admitted by PureCycle in its public filings, Donnally is a director of PureCycle since October 2015 and was CFO of Innventure and Old PCT from October 2015 to October 2020. He serves as CFO for Glockner Enterprises and G-Finance, both of which extended letters of credit to the Company in substantial amounts.  He is thus a non-independent director and therefore is not independent under Nasdaq listing rules. Indeed, PureCycle's Proxy Statement does not list Donnally as an independent director.

102.    Donnally will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments. Donnally held hundreds of thousands of PCT shares, almost 4% of the shares, and 1,500 Incentive Units, which units were converted into restricted stock of PureCycle in the merger. If Donnally acknowledged that he, PureCycle or others had engaged in misconduct, his investment in PureCycle would be substantially devalued.  Further, if Donnally acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor with long term involvement in the Company, either knew of the wrongdoing or should have known of the wrongdoing, which he would not do.

103.    Moreover, Donnally, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

104.    Donnally was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags. Had Donnally taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

105.    Donnally also has a longstanding business relationship with Glockner by virtue of their common association with Glockner Enterprises and G-Finance and his 2% interest in ASC, which precludes them from acting independently and with disinterst.

106.    Donnally is neither disinterest nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Donnally is futile and, thus, excused.

### E.    Demand Upon Defendant Musa Is Excused

107.    Defendant Musa is a Company director and a member of its Audit Committee since the merger in November 2020 pursuant to the Investor Rights Agreement as a designee of the IRA Holders and he is also a member of the Board of ParentCo. As recognized by PureCycle's Form 10-Q for the quarter ended June 30, 2021, Musa's interests are aligned with the interests of the IRA, which may not always coincide with PureCycle's corporate interests or the interests of other stockholders, making Musa incapable of exercising the requisite independence required of him in connection with a shareholder demand.

108.    Moreover, Musa, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance

practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

109.    Musa was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags.  Had Musa taken timely action, the damage caused to PureCycle could have been prevented and minimized.

110.    Further, as a member of the Audit Committee, Musa had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter. In complete disregard of those obligations under the Audit Committee Charter, Musa failed to ensure that an adequate system of internal controls were implemented and maintained, exposing the Company to material financial risk.

111.    Musa has long-standing business relationships with several other directors which precludes them from acting independently and in the shareholders' and Company's best interest. For example, Musa was CFO of Innventure, the majority owner of Old PCT founded and directed by Otworth, Rick Brenner, and Scott.  And Musa is also a director, with Otworth, Rick Brenner, Burnell, Fieler, and Scott, of ParentCo.

112.    Musa is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Musa is futile and, thus, excused.

**F.    Demand Upon Defendant Glockner Is Excused**

113.    As admitted by PureCycle in its public filings, Defendant Glockner is a Company director since October 2015, he was Chairman and CEO of Glockner Enterprises until his retirement in 2019, and he is a controlling director of G-Finance, which supplied Old PCT with a revolving line of credit facility. He is thus a non-independent director and therefore is not

independent under Nasdaq listing rules. Indeed, PureCycle's Proxy Statement does not list Glockner as an independent director.

114.    Glockner will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Glockner held 1,503.75 Incentive Units, which units were converted into restricted stock of PureCycle in the merger.  If Glockner acknowledged that he, PureCycle or others had issued misleading statements, his investment in PureCycle would be substantially devalued.  Further, if Glockner acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as a director of the Company, either knew of the wrongdoing or should have known of the wrongdoing, which he would not do.

115.    Moreover, Glockner, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

116.    Glockner was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags. Had Glockner taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

117.   Glockner has a longstanding business relationship with Donnally by virtue of their association with Glockner Enterprises and G-Finance, and his more than 8% interest in ASC, which precludes them from acting independently and with disinterest.

118.   Glockner is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Glockner is futile and, thus, excused.

### G.     Demand Upon Defendant Fieler Is Excused

119.   Defendant Fieler is a Company director and a member of its Audit Committee since the Merger pursuant to the Investor Rights Agreement as a designee of the IRA Holders and he is also a member of the Board of ParentCo.  As recognized by PureCycle's Form 10-Q for the quarter ended June 30, 2021, Fieler's interests are aligned with the interests of the IRA, which may not always coincide with PureCycle's corporate interests or the interests of other stockholders, making Fieler incapable of exercising the requisite independence required of him in connection with a shareholder demand.

120.   Fieler will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Fieler owned 607,119 shares of ROCH prior to the merger and 1,307,119 shares of ParentCo after the merger, having purchased 700,000 shares of ParentCo stock for $7 million in connection with the PIPE. In fact, Fieler and his Sylebra are the largest shareholders of ParentCo, with 15.6%.  If Fieler acknowledged that he, PureCycle or others had issued misleading statements, his investment in PureCycle would be substantially devalued. Further, if Fieler acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as a major investor in the Company, either knew of the wrongdoing or should have known of the wrongdoing, which he would not do.

121.    Moreover, Fieler, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

122.    Fieler was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags.  Had Fieler taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

123.    Further, as a member of the Audit Committee, Fieler had an additional obligation to protect the Company from material risks through the risk assessment and risk management practices described in the Audit Committee Charter.  In complete disregard of his obligations under the Audit Committee Charter, Fieler failed to ensure that an adequate system of internal controls were implemented and maintained, exposing the Company to material financial risk.

124.    Fieler is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Fieler is futile and, thus, excused.

### H.    Demand Upon Defendant Scott Is Excused

125.    Defendant Scott is Founder and Principal of the Company, served as the Company's (and Innventure's) Chief Science Officer and as a member of Old PCT's board of directors since October 2015, and is a Company director since the Merger and as a director of ParentCo.

Additionally, he has served as a senior scientific advisor to the Company's management team since 2015, and he was intimately engaged together with Otworth in the management and operation of XLTG for more than ten years. He is thus a non-independent director and therefore is not independent under Nasdaq listing rules. Indeed, PureCycle's Proxy Statement does not list Scott as an independent director.

126.    Scott derives substantial income from his employment with PureCycle, in the form of salary and stock awards including $726,500 in fiscal year 2019 alone.  If Scott acknowledged that he, PureCycle, or others engaged in misconduct, his lucrative position would be jeopardized.

127.    Further, Scott will not sue those responsible for the wrongdoing pled herein because doing so would harm him and his investments.  Scott holds 2,723,374 shares of ParentCo's shares, 2+% of the shares.  If Scott acknowledged that he, PureCycle or others had issued misleading statements, his investment in PureCycle would be substantially devalued. Further, if Scott acknowledged that executives at PureCycle had engaged in the wrongdoing alleged, he would be acknowledging that he, as the Chief Science Officer of the Company, either knew of the wrongdoing or should have known of the wrongdoing, which he would not do.

128.    Moreover, Scott, despite owing the highest fiduciary duties of loyalty, good faith, and due care, failed to: (1) implement and maintain an effective system of internal controls over financial reporting and public statements made by the Company's officers to ensure that the Company provided truthful, accurate and complete information in compliance with the federal securities laws; (2) implement and maintain effective internal controls and corporate governance practices and procedures to effectively oversee the material risks posed to the Company; and (3) investigate and take action when presented with red flags of misconduct.

129.    Scott was required to investigate and take action to prevent damage to PureCycle, its shareholders and customers, but failed to take timely action, ignoring all red flags.  Had Scott taken timely action, the damage caused to PureCycle could have been prevented or, at least, minimized.

130.    Scott is neither disinterested nor independent and faces a substantial likelihood of liability for his breaches of fiduciary duty and violations of federal securities laws.  Any demand upon Defendant Scott is futile and, thus, excused.

## I.    Other Factors Demonstrating That Demand Upon The Individual Defendants Is Futile

131.    PureCycle has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not caused the Company to take action to recover for the Company the damages it has suffered and will continue to suffer thereby.

132.    The Board was put on notice of legal and ethical violations at PureCycle, and breaches of its Code of Conduct, as well as other misconduct, but failed to act against those responsible.  Timely action could have prevented, or at least minimized, the damage caused to PureCycle by such misconduct.

133.    The members of the Board received, and continue to receive, substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board. They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof and are incapable of exercising independent objective judgment in deciding whether to bring this action.

134.    Publicly traded companies, such as PureCycle typically carry director & officer liability insurance from which the Company could potentially recover some or all its losses. However, such insurance typically contains an "insured vs. insured" disclaimer that will foreclose

a recovery from the insurers if the Individual Defendants sue each other to recover PureCycle's damages.

## COUNT ONE
### Against the Individual Defendants for
### Violations of Section 20(a) of the Exchange Act

135.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

136.    Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable."

137.    The Individual Defendants, by virtue of their positions with PureCycle and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of PureCycle and officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act.  The Individual Defendants had the power and influence, and exercised same, to cause PureCycle to engage in the illegal conduct and practices complained of herein.

138.    The misleading information contained in the 2021 Proxy Statement constitute material misstatements and omissions which have damaged the Company.  As controlling persons, the Individual Defendants are liable for the primary violations and Plaintiff, on behalf of PureCycle, seeks relief for damages inflicted upon the Company based on the misleading 2021 Proxy Statement.

## COUNT TWO
### Against the Individual Defendants
### for Breach of Fiduciary Duties

139.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

140.     The Individual Defendants owed and owe fiduciary duties to PureCycle.  By reason of their fiduciary relationships, the Individual Defendants specifically owed and owe PureCycle the highest obligation of good faith and loyalty in the administration of PureCycle's affairs.  The Board also had specific fiduciary duties as defined by the Company's corporate governance documents and principles that, had they been discharged in accordance with the Board's obligations, would have prevented the misconduct and consequential harm to PureCycle alleged herein.

141.     The Individual Defendants ignored their obligations under state and federal law. The Individual Defendants failed to make a good faith effort to correct the problems or prevent their occurrence.

142.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties regarding prudently managing the business of PureCycle in a manner consistent with the duties imposed upon them by law.

143.     By committing the misconduct alleged herein, the Individual Defendants breached their duties of good faith and loyalty in the management and administration of PureCycle's affairs and in the use and preservation of PureCycle's assets.

144.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, PureCycle has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.  Such damages include, among other things, the costs of defending and resolving Securities Class Action.

145.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## COUNT THREE
### Against the Individual Defendants
### for Unjust Enrichment

146.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

147.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PureCycle.

148.    The Individual Defendants, based on improper conduct, received bonuses, stock options, or similar compensation from PureCycle that was tied to the performance or artificially inflated valuation of PureCycle, received compensation that was unjust in light of the Individual Defendants' bad faith conduct, or received excessive compensation.

149.    Plaintiff, as a stockholder and a representative of PureCycle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

150.    Plaintiff on behalf of PureCycle has no adequate remedy at law.

## COUNT FOUR
### Against the Individual Defendants
### for Contribution and Indemnification

151.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

152.     The Company's alleged liability on account of the wrongful acts and practices, as well as related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal, and/or bad faith acts or omissions of the Individual Defendants.

153.     The Company has suffered significant and substantial injury as a direct result of the Individual Defendants' actions.   Plaintiff, on behalf of the Company, seeks relief from the Individual Defendants on a theory of contribution and indemnity to the extent that the Company is found liable for the Individual Defendants' actions.

**COUNT FIVE**
**Against the Individual Defendants**
**for Aiding and Abetting**

154.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

155.     Each of the Individual Defendants has acted and is acting with knowledge of or with reckless, or grossly negligent, disregard to the fact that the Individual Defendants are in breach of their duties to the Company and have participated in such breaches of duties.

156.     In committing the wrongful acts, each of the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct.   They have acted in concert with and conspired with one another in furtherance of their common plan or design.   In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided and abetted, and/or assisted, each other in breaching their respective duties.

157.     Because the actions described herein occurred under the Board's supervision and authority, each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

158.     Each of the Individual Defendants aided and abetted each other and rendered substantial assistance in the wrongs complained of herein.

<u>**COUNT SIX**</u>
**Against the Individual Defendants**
**for Gross Mismanagement**

159.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

160.     The Individual Defendants had a duty to the Company and its shareholders to prudently supervise, manage and control the operations, business, and internal controls of the Company.

161.     The Individual Defendants, by their actions and by engaging in the wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to prudently managing the business of the Company in a manner consistent with the duties imposed upon them by law.

162.     During the course of the discharge of their duties, the Individual Defendants knew or disregarded the unreasonable risks and losses associated with their misconduct, yet they caused the Company to engage in the scheme complained of herein which had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of PureCycle, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Defendants violated Section 20(a) of the Exchange Act;

(c)     Declaring that the Defendants have breached and/or aided and abetted the breach

of their fiduciary duties to PureCycle;

      (d)      Declaring that the Defendants have grossly mismanaged PureCycle;

      (e)      Determining and awarding to PureCycle the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

      (f)      Ordering disgorgement of profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties;

      (g)      Awarding PureCycle restitution from Individual Defendants, and each of them;

      (h)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

      (i)      Granting such other and further relief as the Court may deem just and proper.

**DEMAND FOR A JURY TRIAL**

Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Dated: January 27, 2022               Respectfully submitted,

                                 **COOCH AND TAYLOR, P.A.**

                                 */s/ Blake A. Bennett*
                                 Blake A. Bennett (#5133)
                                 The Nemours Building
                                 1007 N. Orange St., Suite 1120
                                 Wilmington, DE  19801
                                 (302) 984-3800
                                 bbennett@coochtaylor.com
                                 *Attorney for Plaintiff*

50

**OF COUNSEL**

WEISSLAW LLP
David C. Katz
Mark D. Smilow
Joshua M. Rubin
305 Broadway, 7th Floor
New York, NY 10007 Telephone: (212) 682-3025
Facsimile: (212) 682-3010
dkatz@weisslawllp.com
msmilow@weisslawllp.com
jrubin@weisslawllp.com

*Plaintiff's Counsel*